# 25-701

## United States Court of Appeals for the Second Circuit

JAMES THOMAS,

*Plaintiff-Appellant,*

v.

OFFICER E. JACOBS, SGT. MILLER, SUPERINTENDENT WILLIAM KEYSER, NURSE LESCANO, SGT. MILISAUSKAS, JOHN DOES 1–5, C.O.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

|  |  |
|---|---|
|  | LETITIA JAMES<br>  *Attorney General*<br>  *State of New York* |
| BARBARA D. UNDERWOOD<br>  *Solicitor General*<br>JUDITH N. VALE<br>  *Deputy Solicitor General*<br>SAMANTHA NEAL<br>  *Assistant Solicitor General*<br>  *of Counsel* | Attorney for Appellees<br>28 Liberty Street<br>New York, New York 10005<br>(212) 416-8066<br><br>Dated: April 29, 2026 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iii

PRELIMINARY STATEMENT.................................................................1

STATEMENT OF THE CASE .................................................................4

    A.   Factual Background.................................................................4

        1.   The February 2019 search.................................................4

        2.   The April 2019 search.................................................11

    B.   Procedural History.................................................................13

        1.   Pleadings and discovery .................................................13

        2.   First decision on appeal.................................................17

    C.   This Appeal .................................................................18

STANDARD OF REVIEW.................................................................21

SUMMARY OF ARGUMENT .................................................................22

ARGUMENT .................................................................27

POINT I

THE DISTRICT COURT CORRECTLY GRANTED
SUMMARY JUDGMENT TO DEFENDANTS.................................................27

    A.   Officer Jacobs Is Entitled to Qualified
       Immunity for the Alleged Search. .................................27

        1.   No clearly established law requires more than
            reasonable suspicion to justify a body cavity
            search of an incarcerated individual.................................29

i

**Page**

2.   No clearly established precedent proscribes the manner in which the search was conducted. .................. 34

B.   The District Court Properly Granted Summary Judgment to Officer Jacobs on Plaintiff's Eighth Amendment Claim. ..................................... 38

C.   The District Court Correctly Granted Summary Judgment to Officers Jacobs and Milisauskas on the First Amendment Retaliation Claims. ............................ 41

1.   No factual disputes preclude summary judgment on the retaliation claim against Milisauskas. ..................... 43

2.   No factual disputes preclude summary judgment on the retaliation claim against Jacobs. ............................. 47

POINT II

THE DISTRICT COURT PROPERLY EXERCISED ITS BROAD DISCRETION IN DECLINING TO REOPEN DISCOVERY OR APPOINT COUNSEL ....................................................... 50

A.   The District Court Properly Exercised Its Discretion in Declining to Reopen Discovery. ........................ 50

B.   The District Court Properly Exercised Its Discretion in Declining to Appoint Plaintiff Pro Bono Counsel. .................. 53

CONCLUSION .................................................................................. 55

ii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alvarez v. Wright,*
797 F. App'x 576 (2d Cir. 2019) ...................................................54-55

*Bell v. Wolfish,*
441 U.S. 520 (1979) ....................................................... 28-29, 34

*Bilal v. White,*
494 F. App'x 143 (2d Cir. 2012) .......................................... 45

*Brandon v. Royce,*
102 F.4th 47 (2d Cir. 2024) ................................................ 51

*Covino v. Patrissi,*
967 F.2d 73 (2d Cir. 1992) ............................................33-34

*Crawford v. Cuomo,*
796 F.3d 252 (2d Cir. 2015) ..........................................38-40

*Davis v. Goord,*
320 F.3d 346 (2d Cir. 2003) .............................................. 46

*Davis v. Scherer,*
468 U.S. 183 (1984) ........................................................38

*Dolan v. Connolly,*
794 F.3d 290 (2d Cir. 2015) .............................................. 42

*Dorsey v. Fisher,*
468 F. App'x 25 (2d Cir. 2012) ........................................... 44

*Farmer v. County of Westchester,*
No. 18-cv-2691, 2021 WL 5605087 (S.D.N.Y. Nov. 30, 2021) ........... 53

*Florence v. Board of Chosen Freeholders,*
566 U.S. 318 (2012) ........................................................ 30

*Ford v. Deacon,*
793 F. App'x 13 (2d Cir. 2019) ........................................... 45

**Cases**                                                        **Page(s)**

*Frost v. New York City Police Dep't,*
  980 F.3d 231 (2d Cir. 2020) ........................................... 37, 41

*Gonzalez v. City of Schenectady,*
  728 F.3d 149 (2d Cir. 2013) ........................................... 30, 37

*Green v. Hallam,*
  105 F. App'x 858 (7th Cir. 2004) ........................................ 33

*Groh v. Ramirez,*
  540 U.S. 551 (2004) ..................................................... 38

*Harris v. Miller,*
  818 F.3d 53 (2d Cir. 2016) .......................... 28, 31-32, 35, 39

*Hayes v. Dahlke,*
  976 F.3d 259 (2d Cir. 2020) ........................................... 42, 49

*Hudson v. Palmer,*
  468 U.S. 517 (1984) ..................................................... 30

*Hynes v. Squillace,*
  143 F.3d 653 (2d Cir. 1998) ............................................. 45

*Isby v. Duckworth,*
  175 F.3d 1020 (7th Cir. 1999) .......................................... 33

*Jackson v. Federal Express,*
  766 F.3d 189 (2d Cir. 2014) ............................................. 53

*Jeffreys v. City of New York,*
  426 F.3d 549 (2d Cir. 2005) ........................................... 21, 47

*Linares v. McLaughlin,*
  423 F. App'x 84 (2d Cir. 2011) ......................................... 44

*Mario v. P & C Food Mkts., Inc.,*
  313 F.3d 758 (2d Cir. 2002) ............................................. 21

iv

| Cases | Page(s) |
|---|---|

*Matusak v. Daminski,*
165 F.4th 702 (2d Cir. 2026) ..................................................................... 37

*Miller v. Wolpoff & Abramson, L.L.P.,*
321 F.3d 292 (2d Cir. 2003) ....................................................................... 21

*Mullenix v. Luna,*
577 U.S. 7 (2015) ........................................................................................ 28

*Overton v. Bazzetta,*
539 U.S. 126 (2003) .................................................................................... 30

*Pabon v. Wright,*
459 F.3d 241 (2d Cir. 2006) ....................................................... 32-33, 38

*Pearson v. Callahan,*
555 U.S. 223 (2009) .................................................................................... 27

*People v. Hall,*
10 N.Y.3d 303 (2008) ................................................................................. 33

*People v. Thomas,*
47 A.D.3d 850 (2d Dep't 2008) ................................................................... 4

*Sanchez v. Bonacchi,*
799 F. App'x 60 (2d Cir. 2020) ................................................................. 30

*Scott v. Coughlin,*
344 F.3d 282 (2d Cir. 2003) ...................................................................... 44

*Sloley v. VanBramer,*
945 F.3d 30 (2d Cir. 2019) ........................................................................ 33

*Torcivia v. Suffolk Cnty.,*
17 F.4th 342 (2d Cir. 2021) ....................................................................... 51

*United States v. Prawl,*
149 F.4th 176 (2d Cir. 2025) ..................................................................... 13

Case: 25-701, 04/29/2026, DktEntry: 59.1, Page 7 of 63

**Cases**                                                  **Page(s)**

*United States v. Wilson,*
   952 F.2d 1400 (9th Cir. 1992) ........................................................... 33

*Walker v. Senecal,*
   130 F.4th 291 (2d Cir. 2025) .................................................. 41, 44-45

*Washington v. County of Rockland,*
   373 F.3d 310 (2d Cir. 2004) ................................................. 43, 45, 47

*White v. Pauly,*
   580 U.S. 73 (2017) ............................................................................ 28

*Zorn v. Linton,*
   146 S. Ct. 926 (2026) .................................................. 23, 27, 32, 34-36

**Statute**

28 U.S.C. § 1915 ................................................................................... 53

**Miscellaneous Authority**

New York State Department of Corrections and Community
   Supervision, Directive No. 4910 (Nov. 9, 2023),
   https://doccs.ny.gov/system/files/documents/
   2024/11/4910_0.pdf ......................................................................... 11

vi

## PRELIMINARY STATEMENT

Plaintiff-appellant James Thomas, an incarcerated individual in the custody of the New York State Department of Corrections and Community Supervision (DOCCS), brings this 42 U.S.C. § 1983 action against two correction officers, defendants-appellees Earl Jacobs and Stephen Milisauskas. The lawsuit arises from a February 2019 incident at Sullivan Correctional Facility, during which Jacobs searched plaintiff based on suspicion that plaintiff was smuggling drugs into the facility in his rectal cavity. The search occurred only after plaintiff had been asked to surrender any drugs and he refused to do so for two days. Plaintiff alleged that during the search, Jacobs used his fingers to remove the drugs from plaintiff's rectum. The search resulted in the recovery of a latex balloon containing drugs.

Plaintiff claimed that Jacobs's search violated plaintiff's Fourth and Eighth Amendment rights. Plaintiff also brought a First Amendment claim alleging that, after he filed a grievance against Jacobs based on the search, Jacobs and Milisauskas retaliated against him with threats and other disciplinary action. The U.S. District Court for the Southern District of

New York (Seibel, J.) granted defendants' motion for summary judgment on all claims.

This court should affirm. Jacobs is entitled to qualified immunity on plaintiff's Fourth Amendment claim. As the district court correctly determined, plaintiff failed to identify clearly established precedent prohibiting the specific conduct alleged here. The uncontroverted record established that Jacobs had at least reasonable suspicion that plaintiff was hiding contraband drugs in his rectal cavity. Neither the Supreme Court nor this Court has ever held that the Fourth Amendment requires a correction officer to have more than reasonable suspicion to justify a body cavity search of an incarcerated individual.

Plaintiff's reliance on general principles, such as that a search supported by reasonable suspicion can violate the Fourth Amendment when conducted unreasonably, lack the specificity required to defeat qualified immunity. And plaintiff fails to identify clearly established precedent prohibiting the manner in which the search was conducted here. For example, the uncontroverted record establishes that the alleged body cavity search lasted, at most, for only a few seconds; that it was conducted in a private room by officers of the same gender as plaintiff; and that physical

2

restraint was used only after plaintiff repeatedly resisted Jacobs's directives to face the wall.

The district court also correctly rejected plaintiff's remaining constitutional claims. The Eighth Amendment claim failed because, inter alia, the record contained no evidence that the search was undertaken to maliciously harm or derive sexual gratification, rather than to recover contraband. Plaintiff's First Amendment retaliation claim against Milisauskas failed because plaintiff provided no evidence that Milisauskas knew that plaintiff had filed a complaint against Jacobs, let alone that such knowledge was causally connected to any adverse action. And the retaliation claim against Jacobs failed because, among other reasons, no tangible proof supported plaintiff's allegation that Jacobs threatened him to induce him to change his story.

## ISSUES PRESENTED

1. Whether the district court properly granted summary judgment to defendants on each of plaintiff's constitutional claims.

2. Whether the district court properly exercised its broad discretion in declining to reopen discovery and to appoint plaintiff pro bono counsel.

3

## STATEMENT OF THE CASE

### A.    Factual Background[1]

Plaintiff is a repeat violent felony offender who is serving a recidivist sentence of twenty-five years to life on his 2005 conviction for robbery in the first degree and several other felonies. *See People v. Thomas*, 47 A.D.3d 850, 850 (2d Dep't 2008) (robbery in the first degree (two counts); grand larceny in the fourth degree; criminal possession of stolen property in the fifth degree).[2]

### 1.    The February 2019 search

In February 2019, plaintiff was housed at Sullivan Correctional Facility in Fallsburg, New York. (*See* Special Appendix (S.A.) 3.) Prior to the incident at issue, plaintiff had been disciplined on at least two prior occasions for smuggling contraband into Sullivan. (Joint Appendix (J.A.) 370.) On February 16, 2019, while plaintiff was in a visitation

---

[1] The following description of events is based primarily on plaintiff's deposition, with additional citations to supporting materials in the joint appendix. Facts based on other sources in the joint appendix are expressly noted.

[2] *See also* Mem. of Law at 1-2, *Thomas v. New York*, No. 08-cv-4389, 2009 WL 763460 (E.D.N.Y. Mar. 23, 2009), ECF No. 3 (listing four violent felony offenses from 1992 to 1998).

room, another incarcerated individual gave him latex balloons carrying several drugs, including suboxone[3] and synthetic marijuana. Plaintiff swallowed some of the drugs and concealed others in latex balloons within his rectum and in his mouth. (*See* J.A. 401-402.)

Plaintiff's smuggling of drugs was discovered through the search that plaintiff challenges in this lawsuit. When plaintiff left the visitation room, a correction officer (who is not a defendant here) conducted a routine external strip search on plaintiff. (*See* J.A. 383-384.) During the search, the officer stated that plaintiff's anus was "shiny" (J.A. 376; Defs.' Local R. 56.1 Statement ¶ 8 (Apr. 28, 2021), ECF No. 59), suggesting that plaintiff had applied Vaseline to his anus to assist in hiding contraband in the rectal cavity and smuggling it into the facility (J.A. 385.) After plaintiff refused to surrender any contraband, he was placed in a dry cell (with no water in the toilet) and was monitored to recover any contraband that he might produce. (S.A. 3-4.) Plaintiff refused to defecate or otherwise surrender the contraband for two days. (*See* S.A. 3-4; J.A. 387.)

---

[3] Suboxone is a narcotic commonly used to treat opioid addiction.

On February 19, 2019, defendant-appellee Officer Earl Jacobs, Sergeant Ronald Miller, and another correction officer entered the dry cell. (S.A. 4; *see* J.A. 388.) Jacobs patted plaintiff down and told the other officer that he felt something in plaintiff's pocket. Jacobs and the other officer led plaintiff towards a designated strip-search room. Jacobs noted that plaintiff's gait was irregular, as if he was "clenching his buttocks while he was walking." (S.A. 4 (alteration and quotation marks omitted); *see* J.A. 389.) According to plaintiff, Jacobs asked Miller if he could retrieve the contraband. (J.A. 389.)

A surveillance camera in the strip-search room recorded a video of the search. The video (which does not have sound) shows Jacobs and another officer escorting plaintiff into the strip-search room, and two additional officers being summoned to the room. (J.A. 600 ("Video") at 00:45-1:11.) One of those officers stood in the doorway as Jacobs removed plaintiff's handcuffs. (*Id.* at 1:11-1:20.) The other two nonparty officers remained in the room as plaintiff undressed. (*Id.* at 1:20-2:07.)

Plaintiff later claimed that he had difficulty complying with the officers' commands because he is hard of hearing. (J.A. 479.) However, the video depicts Jacobs repeatedly pointing to the wall and therefore making

6

a nonverbal command for plaintiff to face the wall, and shows plaintiff repeatedly reflecting that he understood this command by turning to face the wall but then turning back to face the officers. Specifically, the video shows that after Jacobs first pointed at the wall to instruct plaintiff to face the wall, plaintiff initially complied. (Video at 2:17-2:20.) But then plaintiff turned around and seemingly argued with Jacobs, who again pointed to the wall. (*Id.* at 2:19-2:26.) After briefly turning back to the wall, plaintiff turned around again and appeared to continue to argue by gesturing with his hands and talking. (*Id.* at 2:27-2:44.) Jacobs then took hold of plaintiff's arm and held him against the wall, and two of the other officers joined Jacobs to assist in restraining plaintiff. (*Id.* at 2:44-2:50.) When Jacobs was directly behind plaintiff, the video shows him speaking to plaintiff, and plaintiff appears to understand and respond. (*Id.* at 2:55-3:06.) Jacobs then attempted to move plaintiff's right arm behind his back to cuff him. (*Id.* at 3:05-3:09.) Plaintiff attempted to resist, and a struggle ensued. (*Id.* at 3:00-3:14.) A nonparty officer administered pepper spray, but plaintiff continued to struggle.

The video shows that Jacobs initially held plaintiff's upper body. Then, during the struggle, Jacobs bent down to hold plaintiff's legs as the

officers took him to the floor. (*Id.* at 3:06-3:14.) During the three or four seconds during which Jacobs changed his position, the video does not show the placement of Jacobs's hands because other officers are standing in front of him. According to plaintiff, during these few seconds, Jacobs inserted his fingers into plaintiff's rectum to pull out a balloon from plaintiff's anus. *See* Br. for Appellant (Br.) at 9. In his sworn testimony, Jacobs stated that he did not put his fingers in plaintiff's rectum or pull the balloon out, and that the balloon instead fell out during the struggle. (J.A. 345.) The balloon was later confirmed to contain synthetic marijuana and suboxone. (S.A. 3.) Plaintiff does not dispute that a balloon containing drugs was recovered from him during the strip search. (*See* J.A. 443.)

Plaintiff appeared to lose consciousness after the struggle. (Video at 3:55-4:02.) Over the next few minutes, three or four officers waited in the room and appeared to radio for assistance. (*Id.* at 4:02-11:14.) After seven minutes, plaintiff sat up on his own, an officer helped him into clothes, and plaintiff stood up. (*Id.* at 11:14-12:01.) A nurse and wheelchair arrived to transport him to the prison medical facility. (*See id.* at 12:25-13:05; *see also* S.A. at 6).

During an examination, Nurse Lescano flushed the pepper spray from plaintiff's eyes, examined his body, and treated scrapes on his shoulder and knee. Nurse Lescano observed something in plaintiff's mouth and asked him to spit it out. (S.A. 6-7.) Plaintiff spit out another balloon containing drugs. (*See* S.A. 7.)

Nurse Lescano then asked plaintiff whether he had swallowed anything. Plaintiff claims that he said he believed he had, and that she responded, "Well, that's on you" and that "you shouldn't have swallowed something." (S.A. 7 (alteration and quotation marks omitted).) Nurse Lescano's notes and affidavit submitted in support of summary judgment note that plaintiff denied having any other injuries, distress, or discomfort, and that he made no further complaints. Plaintiff was escorted back to his cell. (*See* S.A. 7.) Nurse Lescano checked in on plaintiff a few hours later, and he refused further medical attention. He stated that he wanted to file a Prison Rape Elimination Act (PREA) complaint, and Nurse Lescano reported the request to the on-duty sergeant. (S.A. 7; J.A. 406-407.)

Another nurse checked on plaintiff later that day for monitoring. Plaintiff told that nurse that he may have swallowed a balloon carrying suboxone and synthetic marijuana. Plaintiff was then sent to an outside

9

hospital. (S.A. 7.) His hospital records reflect that he was admitted for "accidental drug overdose," "drug ingestion," and "swallowed foreign body." (S.A. 8 (quotation marks omitted).) The hospital recovered balloons containing drugs from his stool. (S.A. 8.) Plaintiff was discharged from the hospital and returned to Sullivan on February 21, 2019. He did not complain of any pain or bleeding in his anus to medical personnel, nor do hospital records reflect any such complaint or injury. (S.A. 8.)

When plaintiff returned to Sullivan, he was placed in the special housing unit (SHU). While there, he complained that he received inadequate meal portions and that his mail was delayed. He also claimed that at one point, Jacobs told him that if he did not change his story regarding the February 2019 search, that plaintiff would "have it rough" in the SHU because Jacobs's "buddies work down there," and that plaintiff "would starve and nobody would believe anything that he say[s]." (S.A. 8 (quotation marks omitted).)

10

### 2. The April 2019 search

On April 16, 2019, plaintiff was subjected to a search that he claims in this lawsuit was retaliation for him filing a PREA complaint against defendant Jacobs. The search occurred after defendant Officer Stephen Milisauskas, the officer assigned to monitor plaintiff in the SHU, learned from a superior officer that a confidential informant had alerted DOCCS that plaintiff had obtained illegal drugs. (S.A. 9; J.A. 355.) Milisauskas went to plaintiff's cell and observed plaintiff flushing what looked like tobacco[4] down the toilet. (S.A. 9.) During his deposition, plaintiff admitted that it was tobacco and that he was attempting to flush it. (J.A. 422.) Plaintiff claimed that he believed the tobacco was planted on him by officers. (S.A. 9.) After observing plaintiff trying to flush the tobacco, Milisauskas ordered a pat frisk. A non-party officer performed the pat frisk and felt a hard object near plaintiff's groin area. (S.A. 9.)

Plaintiff was then taken to the stripfrisk room and asked to surrender any contraband he was carrying. Plaintiff claims that the officers undertook

---

[4] Tobacco is forbidden, and therefore contraband, in the SHU. *See* DOCCS, Directive No. 4910 (Nov. 9, 2023), https://doccs.ny.gov/system/files/documents/2024/11/4910_0.pdf.

the search to retaliate against him for the complaint he filed against Jacobs. The officers said that, during the April 2019 search, plaintiff himself removed a fragment of a latex glove containing drugs from his rectum. (J.A. 356; *see* J.A. 306.) Plaintiff asserted that officers had planted the drugs on him. (J.A. 423-424.)

Plaintiff was sent to the facility's medical clinic, where he claimed to have swallowed more synthetic marijuana and suboxone. He was immediately sent to an outside hospital because of the serious medical risk created by swallowing those drugs. According to plaintiff, he lied about swallowing contraband to get out of the SHU. No contraband was recovered during this hospital stay. (S.A. 10.)

In his amended complaint and affidavit, plaintiff alleged that during the hospital stay, Jacobs entered plaintiff's hospital room, put his hands around plaintiff's neck, and threatened plaintiff in an effort to induce him to change his story regarding the February 2019 search. (S.A. 10.) However, during his subsequent deposition, plaintiff did not testify about any such incident. (*See* J.A. 411-413.) A logbook from the hospital and video footage from outside plaintiff's hospital room do not reflect that Jacobs saw plaintiff at the hospital at all. (S.A. 10; J.A. 262, 547.)

12

## B.    Procedural History

### 1.    Pleadings and discovery

In July 2019, plaintiff filed his initial complaint pursuant to 42 U.S.C. § 1983, against Jacobs, Sergeant Miller, and William Keyser, the Superintendent of Sullivan Correctional Facility. (J.A. 10-15.) Plaintiff sought $1,000,000 in damages. (J.A. 15.)

In January 2020, plaintiff filed the operative amended complaint. (J.A. 44.) As relevant here,[5] he claims that Jacobs violated his Fourth and Eighth Amendment rights by performing a body cavity search. Plaintiff also alleged that Officers Jacobs and Milisauskas retaliated against him in violation of the First Amendment for filing a PREA complaint against Jacobs. (J.A. 52-54.) Plaintiff claimed that Jacobs retaliated against him by allegedly visiting the hospital and threatening him. See *supra* at 9-10. Plaintiff alleged that Milisauskas retaliated

---

[5] Plaintiff also brought Eighth and Fourteenth Amendment claims against Nurse Lescano, a First Amendment retaliation claim against several unnamed officers, and a failure to protect claim against Superintendent Keyser. Plaintiff does not appeal, and thus abandons, the district court's grant of summary judgment on these claims. *See United States v. Prawl*, 149 F.4th 176, 187 (2d Cir. 2025), *cert. denied*, No. 25-6819, 2026 WL 795074 (Mar. 23, 2026).

against him by conducting the April 2019 search, which resulted in a disciplinary report. (J.A. 51-52).

Plaintiff also filed a motion for the appointment of pro bono counsel. (J.A. 24-25.) Plaintiff acknowledged that he could access the prison law library but asserted that counsel was needed for in-depth research and to cross-examine witnesses at trial. The district court denied the motion as premature without prejudice to renewal. (J.A. 497-498.)

In May 2020, the district court issued a case management and scheduling order, which included a discovery schedule.[6] (J.A. 97-100). The court granted two extensions to the discovery schedule. The first extension was based on plaintiff's representation that he needed more time to review documents and complete discovery. (S.A. 11; J.A. 151-152.) The second extension was to permit defendants to provide responses to plaintiff's

---

[6] Even before discovery began, the court issued multiple directives and orders to accommodate plaintiff's requests for documentation. (*See, e.g.*, J.A. 3 (1/16/2020 Minute Entry) (directing defendants to contact investigators to locate and produce documents requested by plaintiff); J.A. 4 (2/25/2020 Minute Entry) (directing defendants to locate and produce requested SHU logbook to plaintiff); J.A. 5 (4/17/2020, 4/20/2020, and 5/11/2020 Minute Entries) (similar).)

14

interrogatories, which defendants received after discovery had closed (J.A. 139-142).

In April 2021, defendants filed a motion for summary judgment, and plaintiff filed an opposition. Plaintiff did not include any affidavits or documentary evidence contradicting the material facts asserted by defendants. (*See* S.A. 11.) Instead, he filed a one-page letter stating that the motion should be denied because plaintiff's "evidence establish[es] all material facts in this case." (J.A. 148.)

In November 2021, after discovery had closed and while defendants' summary judgment motion was pending, plaintiff wrote a letter to the court asserting that defendants had not responded to his interrogatories; that he had not been able to view the video footage from the February 2019 search; and that the April 2019 video footage from the hospital had been tampered with. (J.A. 151-152.) Defendants submitted a letter in response that reprinted the interrogatory responses that they had already provided to plaintiff (J.A. 158-161) and listed eleven exhibits that they had provided (J.A. 156). Defendants also provided a detailed log specifying each of the four instances during which plaintiff had reviewed the video footage of the February 2019 search. (J.A. 157.) Defendants further explained that

15

the April 2019 footage that plaintiff had requested was provided to him as it was received from the hospital, reiterating that the court had previously considered and rejected plaintiff's unsupported argument that the video had been tampered with. (J.A. 161.)[7]

The district court stated that it was satisfactory. (J.A. 155.) The court also stated that if plaintiff had not timely received the interrogatory responses, he should have notified the court at that time. The district court nonetheless gave plaintiff another opportunity to submit evidence, based on defendants' interrogatory responses, in support of his opposition to summary judgment. Plaintiff submitted a letter reiterating the allegations made in his amended complaint and a DOCCS policy directive. (J.A. 162-170.)

---

[7] Plaintiff alleged that Jacobs had visited him in the hospital on April 18, and requested video footage from the hospital from that date. (*See* J.A. 551.) Defendants obtained that footage from the hospital and provided it to plaintiff. During a December 2020 conference, plaintiff said that Jacobs might have appeared on a different day, because plaintiff had stayed in the hospital for three days. (J.A. 549.) The court ordered defendants to obtain footage from the hospital from each of the days plaintiff stayed in the hospital. (J.A. 552.) Defendants attempted to do so, but the hospital represented that it did not have any more video because all surveillance footage is automatically erased after thirty days. (J.A. 157-158.)

### 2. First decision on appeal

In February 2022, the district court granted defendants' motion for summary judgment, although defendants had not attached the full text of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, as those rules require. (J.A. 173-174.) Plaintiff filed a notice of appeal and moved in this Court for appointment of pro bono counsel on appeal. (J.A. 213-214, 483.) The Court appointed pro bono counsel to brief (i) whether the failure to serve plaintiff with copies of the text of Rule 56 and Local Civil Rule 56.1 warranted vacatur of the summary judgment decision and (ii) any other issues supported by the record. *See* Order, *Thomas v. Jacobs*, No. 22-512, 2024 WL 631404 (2d Cir. Feb. 15, 2024), ECF No. 69. Plaintiff's appellate counsel filed an opening brief challenging only the omission of copies of the rules. *See* Br. & Special Appendix for Pl.-Appellant, *id.*, ECF No 87.

In February 2024, this Court, by summary order, vacated the February 2022 opinion on the sole ground that defendants had not provided plaintiff with the full text of the relevant rules. (J.A. 217-220.) The court remanded the case for further proceedings. (J.A. 220.)

17

### C.    This Appeal

In April 2024, the district court held a status conference in which Plaintiff requested the appointment of pro bono counsel. (*See* J.A. 586, 589.) The district court explained to plaintiff that he was not entitled to counsel because the nature of the complaint was civil, not criminal. (J.A. 589.) The court exercised its discretion to decline to appoint counsel because it did not find it likely that the claims had merit (J.A. 589-590) and because there are far more civil litigants seeking pro bono counsel than attorneys willing to fill that demand (*see* J.A. 516-517, 579, 590).

The court directed defendants to provide plaintiff with the full text of the relevant rules, as this Court had directed, and to refile their motion for summary judgment. The court then explained to plaintiff the requirements for him to properly oppose the motion. The court emphasized that plaintiff should respond with citations to evidence, including his own sworn statements, if he disagreed with statements made in defendants' Local Civil Rule 56.1 statement. (J.A. 590-592.) Plaintiff stated that he understood and that his opposition was already almost complete. (J.A. 595.)

Later that month, defendants refiled their summary judgment motion with the text of the relevant rules attached. (*See* J.A. 221.) In May

18

2024, plaintiff filed an affidavit in opposition to summary judgment. (J.A. 471-477.) In that affidavit, plaintiff stated that he was sexually assaulted by Jacobs, that materials in support of his claim was "missing," that the April 2019 video that he was provided had been tampered with, and that the undisputed evidence would support a jury verdict. (J.A. 473-476.) In June 2024, plaintiff filed an amended affidavit in opposition to summary judgment in which he reiterated that, during the February 2019 search, he was attempting to comply with the officers' commands but that it was difficult to do so because he is hard of hearing. (J.A. 479.)

In February 2025, the district court issued an opinion and order granting defendants' motion for summary judgment based on its thorough review of plaintiff's deposition testimony and the rest of the summary judgment record. (S.A. 1-43.) Crediting plaintiff's version of events, the district court concluded that Jacobs was entitled to qualified immunity on the Fourth Amendment claim. (S.A. 20-21.) The court explained that no clearly established law held that a body cavity search would be unreasonable where, as here, it is undisputed that a correction officer had reasonable suspicion that an incarcerated individual was hiding contraband in his body cavity, and where the alleged search was (inter alia) conducted by

19

an officer of the same gender as the incarcerated individual and in a private setting. (S.A. 20-21.)

The district court also concluded that plaintiff could not sustain an Eighth Amendment claim of excessive force or sexual assault because—even crediting plaintiff's version of events—there was no indication that Jacobs's subjective purpose was to maliciously or sadistically cause harm or derive sexual gratification, rather than to retrieve the balloon of drugs that Jacobs had good reason to believe plaintiff was hiding. (S.A. 21-25.)

With respect to the First Amendment claims, the district court assumed *arguendo* that a PREA complaint had been filed (S.A. at 31 n.21), though the record does not contain a copy of any such report. The district court dismissed the First Amendment retaliation claim against Officer Milisauskas because plaintiff had failed to raise a dispute of material fact about the lack of a causal connection between plaintiff's protected conduct (filing a PREA complaint about the February 2019 search) and the alleged retaliation by Milisauskas (the April 2019 search and resulting disciplinary report). As the court explained, Milisauskas was not involved in the February 2019 search, and no record evidence suggested that he knew about that search. (S.A. 31-37.) The court also dismissed the

20

retaliation claim against Jacobs because, even crediting plaintiff's version of events, Jacobs's alleged actions at the hospital did not rise to the level of an adverse action. (S.A. 37-39.) This appeal followed.

## STANDARD OF REVIEW

This Court reviews de novo a decision on a motion for summary judgment. *See Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 763 (2d Cir. 2002). Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The Court considers whether the record, taken as a whole, could lead a rational trier of fact to find in favor of the nonmoving party. *See id.* But this Court need not credit the nonmovant's testimony where that testimony is contradicted by documentary evidence. *See Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir. 2005).

**SUMMARY OF ARGUMENT**

I. The district court properly granted summary judgment to defendants on each of plaintiff's claims.

A. The district court properly granted summary judgment to Jacobs on plaintiff's Fourth Amendment claim. Jacobs is entitled to qualified immunity on this claim because, even assuming that a body cavity search occurred, no clearly established law prohibited it under the undisputed circumstances presented.

First, there is no dispute of material fact that Jacobs had at least reasonable suspicion that plaintiff was hiding contraband drugs in his rectum. Indeed, the uncontroverted evidence establishes that a correction officer noticed that plaintiff's anus appeared to have Vaseline on it after he left the visitation room; that Jacobs saw a fragment of a latex balloon on the floor of plaintiff's dry cell; and that Jacobs thought plaintiff's gait suggested that he was hiding contraband in his rectum. Contrary to plaintiff's argument on appeal, no precedent from the Supreme Court or this Court holds that the Fourth Amendment requires more than reasonable suspicion (such as a judicial warrant) to justify a body cavity search of an incarcerated individual.

22

Second, plaintiff errs in relying on general principles, such as that a search supported by reasonable suspicion can still violate the Fourth Amendment if it is conducted in an unreasonable or overly forceful manner. The Supreme Court recently emphasized that such general principles lack the high degree of specificity required to defeat qualified immunity. *See Zorn v. Linton*, 146 S. Ct. 926, 930 (2026). Here, plaintiff failed to identify Supreme Court or Second Circuit precedent holding that the alleged search was unreasonable under the specific circumstances presented by the uncontroverted record. For example, there is no dispute that the alleged search was conducted in a private strip frisk room; that the only officers involved were of the same gender (male) as plaintiff; and that the alleged body cavity search lasted, at most, three to four seconds. Moreover, the video recording establishes that the use of physical force to restrain plaintiff occurred only after he repeatedly failed to follow Jacobs's commands to face the wall.

B. The district court properly granted summary judgment on plaintiff's claim that Jacobs's use of force constituted cruel and unusual punishment under the Eighth Amendment. To establish such a claim, an incarcerated individual must establish both that the officer subjectively

23

acted with a malicious or sadistic purpose, and that the conduct was objectively harmful. Here, plaintiff failed to raise a dispute of material fact as to either prong. Nothing in the record suggests that Jacobs acted for any reason other than to recover concealed contraband that Jacobs had reasonable suspicion to conclude plaintiff was hiding. The search lasted only seconds, involved no lewd or gratuitous conduct, and restraint was used only after plaintiff repeatedly refused to follow the officers' commands. Plaintiff's claim that the search was conducted without warning does not defeat summary judgment, particularly when the purpose of the alleged search was to recover contraband that plaintiff had refused to surrender during two days in a dry cell.

C. The district court properly granted summary judgment on the First Amendment retaliation claims. Plaintiff's claim against Officer Milisauskas was based on Milisauskas allegedly conducting the April 2019 search in retaliation for plaintiff filing a complaint against Jacobs. But plaintiff did not provide any evidence that Milisauskas even knew that plaintiff had filed a grievance against Jacobs, let alone that any such knowledge was causally connected to the April 2019 search and corresponding disciplinary report. Indeed, the uncontroverted evidence instead

24

established that Milisauskas conducted the April 2019 search after DOCCS received a tip that Jacobs was hiding contraband and after Milisauskas observed plaintiff trying to flush a substance that looked like tobacco.

Plaintiff's retaliation claim against Jacobs also failed at summary judgment. Plaintiff alleged that, in retaliation for filing a grievance, Jacobs appeared at plaintiff's hospital room, placed his hands around Jacobs's neck, and told Jacobs to change his story about the February 2019 search. But the Court is not required to accept these allegations as true on summary judgment where, as here, the uncontroverted record—which includes hospital visitor logs, video footage, and an affidavit from Jacobs—establishes that Jacobs did not visit plaintiff during his hospital stay. In any event, the district court correctly concluded that the vague threat Jacobs was alleged to have made does not rise to the level of a constitutionally actionable adverse action.

II. There is no merit to plaintiff's arguments that the district court abused its discretion in declining to reopen discovery or to appoint plaintiff pro bono counsel.

A. Plaintiff's argument about reopening discovery fails. This Court's order vacating the first summary judgment ruling, and remanding for further proceedings, was based solely on plaintiff not receiving the full text of Federal Rule of Civil Procedure 56 and Local Rule 56.1. Nothing in this Court's ruling suggested that the district court should reopen discovery. In any event, plaintiff failed to request that the district court reopen discovery and thus failed to preserve this argument for appeal. And the district court was not required to reopen discovery when defendants had provided plaintiff with extensive discovery and had repeatedly made clear that they did not have the further material that plaintiff now seeks to obtain through reopening discovery.

The district court also properly exercised its discretion in declining to appoint plaintiff pro bono counsel. As the district court correctly explained, civil defendants are not entitled to appointment of counsel; plaintiff's case was unlikely to have merit; and there are a limited number of volunteer attorneys available to take on such civil cases pro bono.

26

# ARGUMENT

## POINT I

### THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS

**A.    Officer Jacobs Is Entitled to Qualified Immunity for the Alleged Search.**

The district court correctly determined that Jacobs is entitled to qualified immunity on the Fourth Amendment claim. The doctrine of qualified immunity protects government officials from liability for civil damages where the conduct at issue does not violate a clearly established federal right of which a reasonable officer would have known. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity therefore attaches regardless of whether a constitutional violation ultimately occurred. *See id.* at 231-33. As the Supreme Court recently made clear, general principles—such as that "'an officer may not use unreasonable and excessive force'" in violation of the Fourth Amendment—do not suffice to show that the relevant right is clearly established. *Zorn*, 146 S. Ct. at 930 (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)). Instead, the plaintiff bears the burden of establishing that existing precedent from the Supreme Court or relevant circuit court places the constitutional question, defined at a high

degree of specificity, "beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation marks omitted). Put another way, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted).

Here, no clearly established law would have put a reasonable officer on notice that the alleged search violated the Fourth Amendment. Although incarcerated individuals retain a limited right to bodily privacy under the Fourth Amendment, the carceral setting vastly affects the governing constitutional principles. *See Harris v. Miller*, 818 F.3d 53, 57 (2d Cir. 2016). Where, as here, an incarcerated individual's Fourth Amendment claim challenges an isolated search (rather than a general policy), courts assess the justification for the search, the scope of the intrusion, and the manner and place in which it was conducted. *See id.* at 58; *see Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Jacobs is entitled to qualified immunity under this framework. First, it is undisputed that Jacobs had at least reasonable suspicion to believe that plaintiff was hiding contraband drugs in his body cavity, and no clearly established law provides that any higher level of suspicion (or a judicial

28

warrant) is required to justify a body cavity search of an incarcerated individual. Second, no clearly established law provides that the manner in which the search was conducted was unconstitutional where, as here, only officers of the same gender as plaintiff were involved, the search occurred in a private room out of view of others, and the force used to restrain plaintiff occurred because he was refusing to follow commands to face the wall for a visual search.

### 1. No clearly established law requires more than reasonable suspicion to justify a body cavity search of an incarcerated individual.

In arguing against qualified immunity, plaintiff points to the scope of the intrusion—an alleged body cavity search lasting three to four seconds—and contends that reasonable suspicion that plaintiff was hiding contraband in his rectum was insufficient to justify the search. *See* Br. at 45-46. This argument plainly lacks merit.

The Supreme Court has emphasized that correctional facilities are "unique place[s] fraught with serious security dangers" and that the smuggling of contraband into such facilities is "all too common an occurrence." *Bell*, 441 U.S. at 599. Indeed, incarcerated individuals' attempts to introduce contraband into correction facilities pose "one of the most perplexing

29

problems of prisons." *Hudson v. Palmer*, 468 U.S. 517, 527 (1984); *see Overton v. Bazzetta*, 539 U.S. 126, 134 (2003) ("Drug smuggling and drug use in prison are intractable problems.") Given the importance of maintaining internal security—and the severe threat contraband poses to that security—courts regularly defer to the judgment of prison administrators in conducting searches for contraband, including drugs. *See Hudson*, 468 U.S. at 558; *see also Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 330 (2012).

Against this backdrop, plaintiff fails to identify any precedent from the Supreme Court or this Court holding that a correction officer lacks sufficient justification under the Fourth Amendment to conduct a body cavity search where, as here, the officer had reasonable suspicion that the incarcerated individual was hiding contraband drugs in their body. To the contrary, in *Gonzalez v. City of Schenectady*, this Court determined that correction officers who allegedly pulled a protruding plastic bag of cocaine from an arrestee's anus were entitled to qualified immunity where they had reasonable suspicion that the individual was hiding drugs in their body. *See* 728 F.3d 149, 162 n.7 (2d Cir. 2013); *accord Sanchez v. Bonacchi*, 799 F. App'x 60, 62 (2d Cir. 2020).

30

The same is true here. It is undisputed that Jacobs had at least reasonable suspicion to believe that plaintiff was carrying contraband drugs in his rectum. (Indeed, Jacobs had *more* than reasonable suspicion that plaintiff was hiding drugs in his rectum, though no such higher level of suspicion would have been constitutionally required.) For example, the uncontroverted record establishes that a correction officer noticed that plaintiff's anus was "shiny" after he was in the visitation room (Defs.' Local R. 56.1 Statement ¶ 8), which plaintiff conceded is a term that refers to an incarcerated individual applying Vaseline to assist in smuggling contraband into the facility by hiding it inside his rectum. (*See* J.A. 3-4; *see also* J.A. 384-385.) Jacobs also saw latex balloon fragments on the floor of plaintiff's dry cell (J.A. 389), and noticed that plaintiff's gait was irregular, as if he was "clenching his buttocks while he was walking" (J.A. 389). Based on clearly established law, a reasonable officer would not have concluded that any further justification for a body cavity search was needed under the Fourth Amendment.

The cases on which plaintiff relies do not alter the result. Plaintiff primarily relies on *Harris v. Miller*, in which a correction officer allegedly conducted a visual inspection of an incarcerated plaintiff's genitalia. *See*

31

818 F.3d at 54. But in that case, this Court expressly declined to decide the Fourth Amendment challenge to the alleged search and instead remanded the issue to the district court to consider in the first instance. *See id.* at 63. *Harris* could not have clearly established any right under the Fourth Amendment when that issue was remanded. *See Zorn*, 146 S. Ct. at 930-31. In any event, *Harris* did not establish that any further justification beyond reasonable suspicion would be required for a correction officer to conduct a body cavity or visual search for contraband. The officers there provided "no evidence" and only a "vague" explanation for the search and thus did not have reasonable suspicion that the incarcerated individual was hiding contraband. *See* 818 F.3d at 60-61. Here, unlike in *Harris*, there is no dispute that the search was based on reasonable suspicion.

Plaintiff also errs in relying on out-of-circuit authorities. *See* Br. at 42. When neither the Supreme Court nor this Court has recognized a right, the law of "sister circuits and the holdings of district courts cannot act to render that right clearly established within the Second Circuit." *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006). The cases on which plaintiff relies do not, in any event, place the issue beyond debate, as

32

required to defeat qualified immunity, when other circuits have relied on an officer's reasonable suspicion that contraband is hidden as sufficient justification under the Fourth Amendment for a body cavity search of an incarcerated individual. *See, e.g.*, *Green v. Hallam*, 105 F. App'x 858, 861 (7th Cir. 2004); *Isby v. Duckworth*, 175 F.3d 1020 (7th Cir. 1999); *United States v. Wilson*, 952 F.2d 1400 (9th Cir. 1992).

There is no merit to plaintiff's suggestion that *People v. Hall* clearly establishes a judicial warrant requirement for a body cavity search of an incarcerated individual. *See* 10 N.Y.3d 303 (2008). As an initial matter, *Hall* is a decision by the New York Court of Appeals that does not create clearly established law for federal qualified immunity purposes because it is not a decision by the Supreme Court or this Court. *See Pabon*, 459 F.3d at 255. In any event, even if a decision by the Court of Appeals might be relevant, *see Sloley v. VanBramer*, 945 F.3d 30, 42 (2d Cir. 2019), *Hall* applies only to arrestees and not to individuals who, like plaintiff, have been incarcerated based on a conviction and sentence, *see* 10 N.Y.3d at 310-11. Contrary to plaintiff's contention (Br. at 32), this distinction is dispositive because arrestees retain a wider range of Fourth Amendment protections than incarcerated individuals. *See Hall*, 10 N.Y.3d at 310-11;

33

*Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) (unique security concerns posed by prison facilities require that incarcerated individuals retain a lesser degree of bodily privacy). No decision from the New York Court of Appeals, let alone the Supreme Court or this Court, has extended a judicial warrant requirement to the context of individuals serving a criminal sentence in a correction facility.

### 2. No clearly established precedent proscribes the manner in which the search was conducted.

A body cavity search of an incarcerated individual supported by reasonable suspicion can violate the Fourth Amendment if it is conducted in an unreasonable manner. *See Bell*, 441 U.S. at 560. But plaintiff's invocation of this principle (Br. at 45), does not defeat qualified immunity. As the Supreme Court recently emphasized, principles stated generally, such as that "an officer may not use unreasonable and excessive force," lack the specificity necessary to clearly establish the unlawfulness of an officer's conduct. *Zorn*, 146 S. Ct. at 930 (quotation marks omitted). And even accepting plaintiff's version of the incident, plaintiff fails to identify clearly established precedent holding that a body cavity search supported by

34

reasonable suspicion would be unconstitutional if performed in the manner presented here.

For example, in assessing Fourth Amendment challenges to a search of incarcerated individuals, this Court looks to the location and duration of the search, as well as to the genders of the correction officers and the incarcerated individual. *See Harris*, 818 F.3d at 58. Here, there is no dispute that the alleged search took place in a private stripfrisk room. The uncontroverted evidence also established that the alleged body cavity search occurred, at most, for the three to four seconds during which Jacobs is not visible on the video recording. And it is undisputed that Jacobs and the other officers present during the alleged search are the same gender (male) as plaintiff. Moreover, less intrusive alternatives—including permitting plaintiff two days in a dry cell to voluntarily surrender the contraband—were exhausted before the alleged search occurred. Ultimately, plaintiff failed to identify a Fourth Amendment precedent from the Supreme Court or this Court that every reasonable official would have interpreted as prohibiting a body cavity search under these circumstances. *See Zorn*, 146 S. Ct. at 930 (the right at issue must be defined with a "high degree of specificity," so that "every reasonable official would interpret it

35

to establish the particular rule the plaintiff seeks to apply" (quotation marks omitted)).

Similarly, plaintiff fails to defeat qualified immunity by relying on the generalized principle that, even when based on reasonable suspicion, a body cavity search done in a "violent" or "forceful" manner may contravene the Fourth Amendment. *See* Br. at 40 (quotation marks omitted). That abstract principle lacks the specificity required to put reasonable officers on notice that the conduct alleged here would violate clearly established law. *See Zorn*, 146 S. Ct. at 930-31.

In particular, there is no genuine dispute of material fact that physical restraint was employed only after plaintiff repeatedly refused to follow Jacobs's command to face the wall. Although plaintiff asserted that he was having difficulty hearing Jacobs, the video plainly reflects Jacobs repeatedly pointing to the wall, plaintiff repeatedly complying with that nonverbal command by turning to the wall, and then plaintiff repeatedly failing to comply by turning back around to face Jacobs.[8] See *supra* at 6-

---

[8] To the extent plaintiff takes issue with the administration of pepper spray (*see* Br. at 35), it is undisputed that Jacobs was not the officer who administered it. The officer who did is not a defendant in this case.

7. No clearly established law prohibits the alleged search in these circumstances. *See Frost v. New York City Police Dep't,* 980 F.3d 231, 256 (2d Cir. 2020) (officers justified in using force to extract contraband where incarcerated individual was actively resisting); *Matusak v. Daminski,* 165 F.4th 702, 721 (2d Cir. 2026) (similar).

Moreover, *Gonzalez* confirms that no binding authority clearly proscribed the search at the requisite level of specificity. In *Gonzalez,* this Court applied qualified immunity to a correction officer who removed a bag of cocaine from an arrestee's anus, even though the search was allegedly forceful and purportedly caused severe bleeding that persisted for nearly a year. *See* 728 F.3d at 153, 162 n.7. Here, no evidence suggested that the alleged force caused plaintiff to experience any such persistent injury to his rectum. To the contrary, plaintiff's medical records indicated that plaintiff neither said nor indicated to medical personnel that he was experiencing any pain in or around his rectum. (S.A. 7.) Nor did he complain of or indicate that he was experiencing any such pain during subsequent medical check-ins. (S.A. 7-8.)

Finally, plaintiff misplaces his reliance on DOCCS Directive 4910, which sets forth certain requirements for correction officers to conduct a

37

body cavity search. *See* Br. at 43. It is well established that an official is not deprived of qualified immunity "merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183 (1984); *see also Groh v. Ramirez*, 540 U.S. 551, 564 n.7 (2004) (officer does not lose qualified immunity "whenever he violates an internal guideline"). Plaintiff's failure to identify any Supreme Court or Second Circuit precedent holding that the Fourth Amendment mandates the requirements set forth in DOCCS Directive 4910 is fatal to his argument. *See Pabon*, 459 F.3d at 255.

## B. The District Court Properly Granted Summary Judgment to Officer Jacobs on Plaintiff's Eighth Amendment Claim.

The district court properly concluded that no reasonable juror could find that Jacobs's use of force during the February 2019 search amounted to cruel and unusual punishment prohibited by the Eighth Amendment. To prevail on an Eighth Amendment claim, an incarcerated individual must establish two elements, one subjective and one objective. *See Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). The subjective element requires that the incarcerated individual establish that the defendant officer acted with a "sufficiently culpable state of mind." *Id.*

(quotation marks omitted). The core inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *See id.* at 257-58. The objective element requires the incarcerated individual to establish that the conduct was "harmful enough or sufficiently serious to reach constitutional dimensions." *Id.* (quotation marks omitted). Analysis of the objective prong is "context specific" and turns on "contemporary standards of decency." *Harris*, 818 F.3d at 64.

Plaintiff failed to raise a genuine dispute of material fact as to either element. First, no evidence suggests that Jacobs acted for any reason other than the legitimate penological purpose of recovering contraband he reasonably believed plaintiff was hiding. Plaintiff's argument that there was "no need" for Jacobs to "force his fingers into Plaintiff's rectum without warning" (Br. at 53) overlooks the undisputed facts establishing that the officers had ample justification for the search (see *supra* at 4-6).

Indeed, no reasonable juror could conclude that plaintiff acted maliciously to cause harm rather than to obtain the contraband when Jacobs had refused to surrender the contraband for two days and when Jacobs observed fragments of a latex balloon on the floor of plaintiff's dry

39

cell. Moreover, even crediting plaintiff's version of events, it is undisputed that the alleged body cavity search lasted only a few seconds. There is no evidence to suggest that the search involved any form of lewd or gratuitous touching unrelated to the search for contraband. *See Crawford*, 796 F.3d at 258 (excessive touching and lewd comments rendered search unreasonable). Plaintiff's failure to put forward any evidence that Jacobs acted with malicious or sadistic intent disposes of his Eighth Amendment claim.

*Second*, the district court correctly rejected plaintiff's Eighth Amendment claim for the independent reason that no reasonable juror could conclude that the use of force was objectively harmful or serious enough to constitute cruel and unusual punishment. *See id.* at 256. Here, as explained, the undisputed evidence establishes that plaintiff was physically resisting the officers after refusing to surrender the contraband for two days. No reasonable juror could conclude that the force used to restrain him constituted cruel and unusual punishment where plaintiff repeatedly refused to follow commands to face the wall and had refused to surrender the contraband. Although plaintiff claims he had difficulty hearing Jacobs, the video plainly shows Jacobs pointing to the wall and plaintiff initially

40

complying, but then repeatedly turning around and arguing with Jacobs. (*See* Video at 2:27-2:44.)

Moreover, any injuries sustained after the search were de minimis. Contemporaneous notes taken by Nurse Lescano from her examination of plaintiff shortly after the incident show that plaintiff neither said nor indicated that he was experiencing any pain in or around his rectum. (S.A. 7.) Nor did he complain of or indicate that he was experiencing any such pain during Nurse Lescano's subsequent visit to his cell, when he refused further medical treatment, or when he later told a different nurse that he was experiencing discomfort from having swallowed a latex balloon containing drugs. (S.A. 7-8.) Ultimately, the video footage and other record evidence does not suggest that the officers' actions "could reasonably be viewed as excessive." *See Frost*, 980 F.3d at 256.

**C.  The District Court Correctly Granted Summary Judgment to Officers Jacobs and Milisauskas on the First Amendment Retaliation Claims.**

To sustain a retaliation claim under the First Amendment, an incarcerated individual must demonstrate (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the

42

protected speech and the adverse action. *See Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025). Courts look to the "specific circumstances in which retaliation claims arise," bearing in mind that incarcerated individuals "may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020). Prison retaliation claims are therefore approached with "skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quotation marks omitted).

Here, plaintiff brought a First Amendment claim against Officers Milisauskas and Jacobs, contending that each officer retaliated against him for filing a PREA complaint against Jacobs about the February 2019 search. The district court properly rejected each of these claims.

42

### 1. No factual disputes preclude summary judgment on the retaliation claim against Milisauskas.

Plaintiff's claim against Officer Milisauskas primarily alleges that, in retaliation for the filing of the PREA complaint against Jacobs, Milisauskas conducted the April 2019 search and issued a disciplinary report based on the recovery of contraband that plaintiff asserts was planted on him by Milisauskas. The district court properly concluded that no reasonable juror could conclude that there was the requisite causal connection between the protected activity (filing a complaint against Jacobs) and the alleged adverse action by Milisauskas.

To satisfy the causal connection requirement, the plaintiff must establish that the protected conduct was a "substantial motivating factor" leading to the alleged adverse action. *Washington v. County of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004) (quotation marks omitted). To do so, the plaintiff cannot rely on conclusory assertions and must put forward some "tangible proof" demonstrating that the conduct in question was retaliatory. *Id.* (quotation marks omitted).

Here, plaintiff failed to provide any nonconclusory evidence that could lead a reasonable juror to conclude that his PREA complaint

43

against Jacobs caused Milisauskas to undertake the April 19 search or issue the resulting disciplinary report. For example, there is no evidence to suggest that Milisauskas even knew that plaintiff had filed a complaint against Jacobs, let alone that any such purported knowledge played a substantial part in the April 2019 search and resulting report. *See Walker*, 130 F.4th at 299; *see, e.g.*, *Linares v. McLaughlin*, 423 F. App'x 84, 86 (2d Cir. 2011) (rejecting retaliation claim where plaintiff "presented no evidence" that defendant was aware of protected complaints); *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (rejecting retaliation claim against one officer where plaintiff's grievance was filed against a different officer). Although plaintiff claims that Jacobs warned him to "change his state-ment" or else face retribution from "his buddies" in the SHU (Br. at 57 (quotation marks omitted)), there is no testimony to suggest that Jacobs was referring to Milisauskas in making that statement.

In any event, plaintiff failed to raise a genuine dispute of fact as to whether the April 19 search and resulting report would have occurred regardless of any alleged retaliatory motive. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003). This Court routinely rejects retaliation claims at summary judgment for lack of causation where there is no dispute

44

of material fact that a plausible alternative explanation explains the allegedly adverse action. *See Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998); *Ford v. Deacon*, 793 F. App'x 13, 16 (2d Cir. 2019); *see also Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012).

That is the situation here. The uncontroverted evidence demonstrates that Officer Milisauskas conducted the April 19 search because he had reason to believe that plaintiff was hiding contraband. Specifically, the undisputed record establishes that Milisauskas conducted the search after DOCCS received a tip that plaintiff was concealing contraband (S.A. 9; J.A. 355) and after Milisauskas personally observed plaintiff trying to flush a substance that looked like tobacco (S.A. 9.) Moreover, it is undisputed that the April 2019 search resulted in the recovery of contraband. (S.A. 9). Plaintiff's conclusory assertion that the contraband was planted on him by correction officers is unsupported by any evidence and is thus insufficient to defeat summary judgment. *See Walker*, 130 F.4th at 299-300; *County of Rockland*, 373 F.3d at 321.

Plaintiff's conclusory allegations about purported delay in the receipt of his mail or the portion sizes of his meals (*see* Br. at 12) also fail to support his retaliation claim against Milisauskas. As an initial matter, as

45

discussed, there is no nonconclusory evidence to suggest that Milisauskas even knew about plaintiff's complaint against Jacobs. And there is no nonconclusory evidence suggesting that allegedly inadequate meal portions or delayed mail were causally connected to the complaint filed against Jacobs. To the extent plaintiff claimed in his deposition that Jacobs told him that he would "starve" in the SHU (S.A. 8 (quotation marks omitted)), plaintiff does not allege that Milisauskas was aware of or was in any way connected to such comment.

In any event, there is no dispute that the alleged mail delay occurred just after the onset of the COVID-19 pandemic (*see* J.A. 140, 508-510), which provided a plausible, nonretaliatory reason for the delay. And plaintiff failed to raise a dispute of material fact that mail delay caused anything more than a de minimis injury. *See Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (de minimis allegations of retaliation-induced harm are not actionable).

46

### 2. No factual disputes preclude summary judgment on the retaliation claim against Jacobs.

The district court correctly granted summary judgment to Jacobs on plaintiff's retaliation claim. Plaintiff stated for the first time in his amended complaint and in an affidavit (but did not testify in his deposition) that Jacobs retaliated against him by entering plaintiff's hospital room, putting his hands around plaintiff's neck, and telling him to "change his story." (S.A. 10, 14.) But this allegation is not supported by any tangible proof in the summary judgment record and is instead contradicted by the undisputed evidence. (*See* S.A. 10; J.A. 262, 547.) Plaintiff's allegation is thus insufficient to sustain plaintiff's retaliation claim against summary judgment. *See County of Rockland*, 373 F.3d at 321; *Jeffreys*, 426 F.3d at 554-55.

Indeed, the uncontroverted evidence—including video recording of the hallway outside plaintiff's hospital room, hospital visitor logs, and testimony from Jacobs—demonstrate that Jacobs never visited plaintiff during his hospital stay. (J.A. 158-161.) And during his own deposition, plaintiff did not testify that any such incident occurred in the hospital despite describing other allegedly retaliatory acts undertaken by Jacobs or Milisauskas. (J.A. 411-413.)

47

No reasonable jury could conclude that defendants tampered with or withheld documentation or videos pertaining to the hospital, as plaintiff baselessly contends. (Br. at 17, 20, 63). Defendants submitted a letter to the district court specifying that they had provided plaintiff all documentation in their possession that he had requested. (J.A. 157-161.) The letter also included a detailed log detailing each of the four instances that plaintiff had reviewed the video footage of the February 2019 search. (J.A. 157.) Defendants also explained that the April 2019 hospital footage was provided to plaintiff as it was received from the hospital, and that other hospital footage did not exist because the hospital routinely destroys footage after thirty days. (*See* J.A. 157-158.) See *supra* at 16 note 7. The district court stated that the response was satisfactory. (J.A. 155.) As the district court made clear, defendants cannot provide video footage that does not exist. (*See* J.A. 594.)

In any event, even accepting plaintiff's unsupported allegation about Jacobs going to the hospital room, no reasonable jury could conclude that the alleged conduct rose to the level of an adverse action under the First Amendment—as the district court properly held. (S.A. 37-39.) It is well established that vague threats, such as Jacobs allegedly telling plaintiff

48

to "change his story," do not amount to First Amendment retaliation. *See Hayes*, 976 F.3d at 266, 274 (no retaliation where the correction officer told plaintiff that "maybe all of this would go away" if he stopped filing grievances (quotation marks omitted)). And plaintiff did not present any evidence regarding the severity of any alleged physical contact by Jacobs or any alleged injuries resulting from the encounter. (*See* S.A. 39.) Summary judgment was thus proper.

## POINT II

**THE DISTRICT COURT PROPERLY EXERCISED ITS BROAD DISCRETION IN DECLINING TO REOPEN DISCOVERY OR APPOINT COUNSEL**

Plaintiff argues that, after this Court vacated the first summary judgment ruling and remanded the case for further proceedings, the district court abused its discretion by declining to reopen discovery or to appoint plaintiff pro bono counsel. Neither argument has merit.

### A.    The District Court Properly Exercised Its Discretion in Declining to Reopen Discovery.

The district court was not required to reopen discovery, which had twice been extended and had closed before the filing of the first summary judgment motion. As an initial matter, this Court's vacatur of the district court's original summary judgment decision was based solely on a limited procedural issue—that defendants had not provided the text of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1 to plaintiff. This Court instructed defendants to provide plaintiff with the text of those rules on remand (J.A. 218-222), which defendants promptly did (J.A. 221). Nothing in this Court's decision remotely suggested that the district court should reopen discovery on remand rather than proceed with defendants' summary judgment motion after the text of the rules had been provided.

50

Nor did plaintiff's pro bono counsel on appeal make any argument to this Court that discovery was deficient or should be reopened on remand, despite this Court's express instruction that counsel should brief not only the notice issue but also "any others supported by the record." *See* Order, *Thomas*, No. 22-512, 2024 WL 631404, ECF No. 69. This Court's prior decision thus did not provide any basis for reopening discovery.

In any event, on remand, plaintiff did not make any request to the district court to reopen discovery (J.A. 471-472), and he thus failed to preserve this argument for appeal, *see Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021). Although plaintiff was proceeding pro se in the district court, he filed several discovery-related requests throughout the course of litigation, indicating that he was capable of doing so. (*See, e.g.*, J.A. 67, 70, 121-122, 151-152, 166.) The district court was under no obligation to reopen discovery sua sponte. *See Brandon v. Royce*, 102 F.4th 47, 58 (2d Cir. 2024).

Moreover, even assuming plaintiff had sought to reopen discovery, there would have been no basis for doing so. The litigants had ample opportunities to pursue discovery, and plaintiff does not point to the existence of any discoverable material that would place material facts in dispute.

51

For example, before discovery began, the court issued multiple directives and orders to accommodate plaintiff's requests for documentation. See *supra* at 14 note 6. The district court twice granted extensions to complete discovery, the first based on plaintiff's representation that he had not received certain discovery and needed more time to review documents (S.A. 11; *see* J.A. 155-161), and the second to permit defendants to provide responses to plaintiff's interrogatories—which were received by defendants after discovery had closed (J.A. 139-142).

There is no merit to plaintiff's contention (*see* Br. at 63) that defendants failed to comply with their discovery obligations. Defendants disclosed all relevant documents within their possession. (J.A. 156-161.) They answered plaintiff's interrogatories (J.A. 139-142); indeed, plaintiff confirmed receipt of those answers (*see* J.A. 162). Plaintiff was also permitted to view the video of the February 2019 search on several occasions. (J.A. 157.) And as explained, defendants provided plaintiff the April 18, 2019 hospital video that he had requested (J.A. 156-161), and no further video existed because the hospital had stated "they have nothing else [and] 'all surveillance footage is automatically erased after 30 days'" (J.A. 158). The district court did not abuse its discretion in declining to sua sponte

52

reopen discovery where, as here, defendants previously represented that they did not have the materials that plaintiff had been seeking. *See Jackson v. Federal Express*, 766 F.3d 189, 199 (2d Cir. 2014).

## B. The District Court Properly Exercised Its Discretion in Declining to Appoint Plaintiff Pro Bono Counsel.

The district court likewise did not abuse its discretion in declining to appoint plaintiff pro bono counsel after this Court's remand. Appointment of pro bono counsel in civil cases is a quintessentially discretionary determination that permits the district court to assess whether a litigant's position is likely to be meritorious before making any such assignment. *See* 28 U.S.C. § 1915(e)(1). Appointment of counsel in civil cases is a rare event in the U.S. District Court for the Southern District of New York due to limited resources and other circumstances. *See Farmer v. County of Westchester*, No. 18-cv-2691, 2021 WL 5605087, at *1 (S.D.N.Y. Nov. 30, 2021). Indeed, as the district court repeatedly explained, civil litigants are not entitled to counsel and the number of pro se litigants seeking pro bono

53

counsel far exceeds the number of volunteers available to take cases. [9] (J.A. 516-517, 579, 590.)

The district court ultimately concluded that assignment of pro bono counsel was unwarranted because plaintiff's case was unlikely to have merit.[10] (J.A. 589.) The court further noted that it would reassess the potential need for volunteer counsel if the case were to proceed to trial. (J.A. 579, 589-590.) Moreover, the district court emphasized that plaintiff had repeatedly shown that he was able to request documents and make arguments during the litigation. (*See* J.A. 590.) And the court explained to plaintiff that, after defendants refiled the motion for summary judgment, he needed to respond with citations to evidence in the record. (J.A. 590-592.) Plaintiff affirmed that he understood and that his opposition was nearly

---

[9] It is immaterial that plaintiff contends (*see* Br. at 68) that the request for counsel was made more than once. *See Alvarez v. Wright*, 797 F. App'x 576, 578 (2d Cir. 2019) (affirming denial of pro se incarcerated individual's request for counsel, even though individual had made such request three times).

[10] Contrary to plaintiff's assertion (*see* Br. at 68), this Court's decision on the first summary judgment decision did not pass on the merits of the case. The district court properly understood the decision to be limited to the notice issue discussed *supra* at 17. (*See* J.A. 217-220.)

complete. (J.A. 595.) There is no basis to disturb the district court's discretionary decision declining to appoint counsel here. *See Alvarez v. Wright*, 797 F. App'x 576, 579 (2d Cir. 2019).

## CONCLUSION

This Court should affirm the district court's grant of summary judgment on all claims.

Dated:  New York, New York
        April 29, 2026

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees

By: _____
    SAMANTHA NEAL
    Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
SAMANTHA NEAL
  *Assistant Solicitor General*
     *of Counsel*

28 Liberty Street
New York, New York 10005
(212) 416-8066

55

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Mary Quinn Moss, an employee in the Office of the New York State Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 10,566 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Mary Quinn Moss*